FILED

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### MIDDLE DIVISION

99 SEP 27 AM 10: 5

U.S. DISTRICT COURT
N.D. OF ALABAMA

| | |
|---|---|
| REGINALD TAYLOR, | ) |
| Plaintiff | ) |
| | ) |
| vs. | ) CASE NO. CV98-HGD-1635-M |
| | ) |
| U.S. STEEL MINING CO., LLC, | ) |
| d/b/a OAK GROVE MINES, | ) |
| | ) |
| Defendant | ) |

ENTERED

SEP 27 1999

## MEMORANDUM OPINION

The above-entitled civil action is before the court on the motion for summary judgment filed by defendant U.S. Steel Mining Company, LLC, d/b/a Oak Grove Mines [Doc. #25] and the motion for partial summary judgment filed by plaintiff, Reginald Taylor [Doc. #27]. The parties have submitted all materials in support of and in opposition to the motions, and the motions are ready for ruling.

### PROCEDURAL BACKGROUND

Plaintiff commenced this action by filing a complaint on June 25, 1998, against U.S. Steel Mining Company, LLC, d/b/a Oak Grove Mines (USM). In his complaint, Mr. Taylor alleges causes of action pursuant to the Family and Medical Leave Act (FMLA) and 42 U.S.C. § 1981, for race discrimination, disparate treatment, and retaliatory termination. Plaintiff states that he is black and worked for USM for 21 years as a shuttle car operator. In March 1996, Taylor took time off work

because his son was injured in an automobile wreck and because Taylor was having back problems, for which he had been seeing his doctor on a regular basis. When Taylor returned to work with a doctor's excuse, he was suspended for two days. Plaintiff alleges that Ken Butler, a white employee, was not suspended when he took off work for his wife's illness. Plaintiff supplied a doctor's excuse for any missed work; however, he was suspended a second time on June 27, 1996, for a period of five days, for exceeding the mine average for absences. Taylor alleges white employees were not suspended for the same actions. On July 1, 1996, Taylor met with company representatives regarding the action to be taken against him for his excessive absences (firing or probation). Taylor was fired for excessive absences on July 1, 1996. Taylor claims that he was not terminated until he complained, through the union representing USM employees, about the suspension policy and perceived racial discrimination. Plaintiff further alleges that defendant failed to provide notices required by the FMLA each time Taylor was absent from work due to his illness or his son's injuries.

Defendant, in its answer filed July 20, 1998, avers as affirmative defenses that plaintiff failed to exhaust mandatory administrative, grievance and arbitration remedies, and failed to satisfy various requirements of the FMLA. With respect to plaintiff's FMLA claim, defendant contends he was not suffering from a serious health condition within the meaning of the statute and that his claim is barred in part by the applicable statute of limitations.

Defendant filed its motion for summary judgment with respect to all claims asserted by plaintiff on February 26, 1999. Plaintiff also filed his motion for partial summary judgment, with respect to his FMLA claim, on February 26, 1999.

2

## THE MOTIONS FOR SUMMARY JUDGMENT

In its motion for summary judgment, USM asserts that plaintiff has not made out a *prima facie* case of race discrimination or retaliation. In the alternative, USM avers that it had a legitimate, non-discriminatory reason for its termination of plaintiff's employment that plaintiff cannot show was pretextual. Defendant asserts that plaintiff was terminated from his employment due to chronic and excessive absenteeism, and not due to any racial discrimination or retaliation. Defendant contends plaintiff's retaliation claim is without merit because the undisputed evidence establishes that plaintiff made no statutorily protected complaint of race discrimination prior to defendant's decision to terminate his employment, and the decision was based on legitimate reasons.

Defendant also contends that it fully complied with FMLA policies and procedures, as contained in the collective bargaining agreement between USM and the United Mineworkers Union, and plaintiff failed to follow those procedures. It is alleged that plaintiff's ailments (high blood pressure, back pain, and migraine headaches) did not amount to a "serious health condition" as defined by the FMLA, such as to bring his absences within FMLA coverage. It is claimed that plaintiff's medical absences were not for reasons that would bring him within the ambit of the FMLA and, further, that plaintiff never requested FMLA leave.[1] Defendant argues that Taylor never was denied FMLA leave because he never requested it. Defendant also argues that plaintiff's FMLA claim is outside the two-year statute of limitations, and he has never alleged that defendant acted

---

[1] According to Les Morgan, during the time period in question, Morgan did not "recall being provided with the kind of information that would lead [him] to believe that the absence was covered by [the] Family Medical [Leave Act]. But, at any rate, it wasn't requested." [Morgan Depo. at 24].

3

willfully or deliberately such as to bring the action within the purview of the three-year statute of limitations.

In response, plaintiff contends that he has made out a *prima facie* case of race discrimination in the terms and conditions of his employment and in his termination. He avers that a similarly situated white employee, Ken Butler, was not subjected to USM's absence policy despite numerous absences and was suspended rather than terminated for an unexplained absence. When plaintiff asked for suspension rather than termination, referring to Ken Butler, he was refused. Plaintiff also relies on the affidavit of a USM employee averring that two white employees were not disciplined or terminated for excessive absences.

Mr. Taylor, in his motion for partial summary judgment and in response to defendant's motion for summary judgment, contends that USM's medical leave policy, as set out in the collective bargaining agreement, contravenes the policy behind the FMLA and its interpretive regulations. He asks for summary judgment on his FMLA claim with respect to liability, with damages to be assessed by a jury. Plaintiff asserts that the evidence establishes that defendant failed to follow the notice and leave requirements of the FMLA, in that he was not provided with any notice of his rights under the FMLA when he requested medical leave. Instead, defendant's practice is to require its employees to inquire expressly about FMLA leave when requesting medical leave. Plaintiff also argues that his medical conditions indeed were serious, as was his son's; therefore, he was entitled to FMLA leave. He also asserts that USM's policy of counting FMLA-covered absences against its employees, for purposes of its absence policy, should not be permitted by the courts. He further claims that the three-year FMLA statute of limitations should apply because defendant's alleged violation was willful and deliberate.

4

The arguments made by the parties with respect to plaintiff's motion for partial summary judgment are the same as made in support of and in opposition to defendant's motion for summary judgment.

### FINDINGS OF FACT

Defendant operates an underground coal mine, the Oak Grove Mine, in Jefferson County, Alabama. George Weber, USM's president, is located at USM's Philadelphia office. At the Oak Grove Mine, Les Morgan is the Manager of Administration, with responsibility for human resources issues. Ron Osborne is the General Manager for USM's Southern Systems, and is the highest ranking management official at the Oak Grove Mine.

USM has a collective bargaining agreement (CBA) with the United Mineworkers of America, the union that represents the mine employees, including plaintiff. Whenever a new CBA is negotiated, UMWA officials explain the terms to employees and distribute copies of the new agreement. The CBA at issue is the 1993 USM-UMWA Wage Agreement. Plaintiff received a copy of the CBA, and the union had meetings with the employees to advise them of any new policies or procedures. The union representatives at the times pertinent to this action were Gary Pickett, Rex Tanner, Larry Pasquale and Hank Key. The 1993 CBA provides in pertinent part in Article IX(f):

> (1) Any Employee who has been employed for a total of at least twelve (12) months with Employers signatory to this Agreement and has worked for a covered Employer at least 1,250 hours over the previous 12 months shall be entitled to 12 weeks of unpaid leave of absence consistent with the provisions of the Family and Medical Leave Act of 1993 for any of the following reasons:
> * * * * *

5

c. in order to care for the spouse, or a son, daughter, or parents, of the Employee, if such a spouse, son, daughter, or parent has a serious health condition;

d. because of a serious health condition that makes the Employee unable to perform the functions of his job.

\* \* \* \* \*

Leave for serious health conditions—either of a family member of the Employee or of the Employee—may be taken intermittently or on a reduced schedule if such leave is medically necessary.

\* \* \* \* \*

(3) An Employee who intends to take unpaid leave under the FMLA should give the Employer advance notice of his or her intention to take FMLA leave 30 calendar days before the leave is to commence. Where the need for FMLA leave is not foreseeable 30 days before the leave is to commence, the Employee shall give the Employer notice of the Employee's intent to take unpaid FMLA leave as soon as practicable upon learning of the need for FMLA leave. Nothing in this provision shall diminish an Employee's rights to paid leave under this Agreement, regardless of whether the paid leave might also qualify as FMLA leave.

(4) In the event that a request for leave is made by an Employee eligible for leave under the Family and Medical Leave Act of 1993, the following shall apply:

a. Unpaid Leave

Family and medical leave is unpaid leave, except as provided in subsection (b) below.

b. Use of Paid Leave

(1) If an Employee requests leave based on . . . the need to care for a sick parent, son, daughter or spouse, the Employee shall first substitute all of the Employee's accrued vacation and personal leave for leave available under the Family and Medical Leave Act. Such paid leave shall count toward the Employee's 12-week leave entitlement.

(2) If an Employee requests leave based on the Employee's own serious health condition or the serious health condition of the parent, spouse, son or daughter, the Employee shall first substitute all of the Employee's accrued vacation, personal and sick leave, and, if eligible, sickness and accident benefits, for leave available under the family and Medical Leave Act. Such leave shall count toward the Employee's 12-week leave entitlement.

6

c. Miscellaneous

An Employee shall be entitled to only such family and medical leave as required by the Family and Medical Leave Act and any applicable laws of the State in which the Employee is employed. Nothing herein waives or limits the rights that Employers have under the Family and Medical leave Act including, but not limited to, the right to require medical certifications to support requests for leave and for return to work, to transfer temporarily Employees taking intermittent leave, and to designate, where permissible, leave taken by Employees as leave under the Family and Medical Leave Act.

USM also has a progressive discipline program for employees who are absent from work with a greater frequency than the average absences of all mine employees. The program provides that employees absent with a greater frequency than the mine average during a one-year period are placed in Step 1 of the program. The company considers an employee to be an "irregular worker" if the employee is absent 20 or more days in a one-year period due to "unexcused absences or absences covered by sickness," whether work is missed for personal or family illness and even where the employee has a doctor's excuse. [Morgan Depo. at 17-18]. The company reviews the amount of absences, their frequency or repetitiveness, and the explanations for the absences. The company and union representatives meet with an employee designated as an "irregular worker" and placed in Step 1 and notify the employee that he will be reviewed after three 30-day periods.

If an employee in Step 1 exceeds the mine absentee average over any of the next three months after placement in Step 1, he receives a written reprimand and is placed in Step 2 of the chronic and excessive absenteeism program. If his absence average remains at or below the mine average for the three periods, he is taken out of the program. If the employee is moved to Step 2, after another three-month period, his record is reviewed. If his absences are at or below the mine

7

average, he is put back in Step 1. However, if his absences exceed the mine average for any of the 30-day periods in the preceding three months, he is placed in Step 3 of the program and suspended for two days.

After three additional 30-day periods, the employee's attendance rate is reviewed again. If his absence rate is below the mine average for all three periods, he goes back to Step 2. However, if his absentee rate is above the mine average, he proceeds to Step 4, which involves a five-day suspension with the intent to terminate and a written notice of the intent to terminate. Within 24 to 48 hours after receipt of a notice of suspension with intent to discharge, and employee may request a meeting with management and union representatives. At that meeting, usually held after the five-day suspension, the employee is told whether management will follow up on its decision to terminate the employee. Under the CBA, the employee has five days after provision of the written notice of suspension with intent to terminate to file a grievance, in the absence of which the discharge becomes effective immediately upon the end of the suspension period. The UMWA has the right to pursue binding arbitration on behalf of the employee if it believes that just cause to terminate the employee does not exist.

Plaintiff is black and was born on March 31, 1952. He began his employment with USM at the Oak Grove Mine on or about November 25, 1976. His job assignment at the time of his termination in July 1996 was shuttle car operator. Prior to that, he was a scoop operator.

According to plaintiff's Individual Absence Record submitted by defendant, which shows plaintiff's sick leave in 1994, plaintiff was absent from work for three days in February, with a notation of "chest pain;" for two days in March for "stomach virus;" and for four days in April for "chest pain" and "hypertension." In May 1994, plaintiff was involved in an automobile accident and

8

was absent a total of 10 days. According to plaintiff, he injured his neck and back. [Plaintiff's Depo. at 88]. The notations on the record for that month, apart from "car accident," are "abdominal pain" and "head injury." In June 1994, plaintiff was absent for 14 days due to the previous month's accident for chiropractic treatment. Plaintiff was absent for two days in July, three days in August, one day in September, and five days in October; there are no notations as to the reason for these absences. In November 1994, plaintiff missed four days, due to a cold and chest pain. Plaintiff was absent for three days in December, cause unknown. There is no such useful information for 1995 or 1996. Plaintiff states, and the court will consider as true, that he missed work for back pain, migraines or hypertension, and had a doctor's excuse for each such absence. For those days, he seeks a determination of the applicability of the FMLA.

Plaintiff's son, Kareem, was injured in an automobile accident on February 18, 1996. Kareem remained in the hospital approximately 45 days. Plaintiff was absent from work to care for his son; however, there is no indication in the record of the days plaintiff took off for that purpose. Plaintiff asked Paul Boyd, his foreman, to give him four of his floating days off because of his son's car wreck. [Plaintiff's Depo. at 44].

Plaintiff states that he has no documents to reflect that he specifically requested FMLA leave. He testified in his deposition that he never "requested family leave other than when [he] was off sick or something, and [he would] bring . . . a doctor's excuse back." For those days, he got "sick days." [Plaintiff's Depo. at 45]. Plaintiff asserts that defendant never advised him about its medical leave policy and he never asked about it. [*Id.* at 98]. He also denies ever having seen the company's posted FMLA policy.

9

On March 20, 1995, plaintiff was counseled and placed in Step 1 of the chronic and excessive absenteeism program. He did not file a grievance or EEOC complaint about his placement in the program. For the period of January 31, 1994, to January 31, 1995, plaintiff could have worked a total of 279 days. However, plaintiff had 42 paid leave and sick days and also took off 53 additional days, leaving 184 days actually worked. His absenteeism rate for the one-year period was 18.9%, while the mine average during that period was 6.18%. When he was placed in the absentee program, plaintiff was aware that he had three 30-day periods to satisfy attendance requirements [Plaintiff's Depo. at 75].

Plaintiff's attendance record was reviewed on August 10, 1995, by Les Morgan and union representatives. During the preceding three months, he exceeded the mine average for absences for one month, being absent two of the 30 days. Plaintiff states he came to work sick during the preceding three months because he wanted to keep his job. [*Id.* at 77]. Despite the excessive absences during one month, plaintiff was retained in Step 1 of the program. He did not file a grievance or EEOC complaint. On December 1, 1995, plaintiff received a written warning regarding his attendance and was placed in Step 2 of the absentee program. His absenteeism rate for the preceding 30-day period was 32%; he was absent for nine non-contractually paid days. Plaintiff did not file a grievance about being put in Step 2.

On March 26, 1996, plaintiff was placed in Step 3 of the absentee program for again exceeding the mine average, having been absent for 19 of the preceding 90 days.[2] He also was

---

[2] Plaintiff states he was absent from work one day during this period because he hurt his back while picking up a plumbing snake at home. Plaintiff brought a doctor's excuse when he returned to work. It was during this three-month period that plaintiff's son was injured in the motor vehicle accident.

10

suspended for two days. Plaintiff called George Weber to complain about this suspension because

he had a doctor's excuse; plaintiff never mentioned race discrimination during this telephone call.

Weber advised plaintiff that he would call the Oak Grove Mine. Mike Queen later told plaintiff that

Weber had called but that his suspension would not be rescinded.

On June 27, 1996, plaintiff was informed in writing that he was suspended with the intent

to discharge for "continued unacceptable attendance." During one of the 30-day periods preceding

the June 27 notice, plaintiff had been absent for five days, for an absentee rate of 18.5%. His

suspension began on June 27, with discharge to become effective five days later. When plaintiff

received the notice, he and his union representative requested a 24/48 meeting. That meeting took

place on July 1, 1996.

Plaintiff was terminated from his job on July 1, 1996. At the 24/48 meeting were plaintiff,

Les Morgan and other management representatives, and union representatives Gary Pickett, Rex

Tanner, Larry Pasquale, and Hank Key. Pickett went into another room to talk to Ron Osborne

about the possibility of continuing plaintiff's employment or suspending him rather than terminating

him. Pickett, at plaintiff's request that he be given the same 30 or 60-day suspension as given Ken

Butler (a white employee) for absenteeism, asked that plaintiff be suspended for 30 or 60 days rather

than terminated. Plaintiff, Tanner, Pasquale and Key waited at the table in the meantime. When

Pickett emerged from the room, he advised, according to plaintiff, that the company would be

dismissing plaintiff "because Ron Osborne didn't want [him] back because [he] called the president

of the company." [Plaintiff's Depo. at 35]. Plaintiff averred in his deposition that defendant's

management had been mad at him ever since he called the company president. In response to the

11

deposition question, "So you believe really the reason they terminated you and why they were mad at you is because you went over their heads to the president of the company?", plaintiff responded, "Yes, sir, I absolutely believe it." [*Id.* at 49-50] The union refused to file a grievance or seek arbitration on plaintiff's behalf after the decision to terminate his employment.[3] Plaintiff also did not claim race discrimination through the union, nor did he ever complain of race discrimination to Les Morgan. Plaintiff admits that at no time did Les Morgan or Ron Osborne ever direct racial slurs toward him or make racial slurs overheard by plaintiff.

Approximately a week after his termination, plaintiff again called Mr. Weber. He told Weber he was fired because he had called Weber before. [*Id.* at 50]. He also made his first claim that his termination or the difference in discipline was racially motivated. Plaintiff referred to Ken Butler, and the fact that Butler was absent from work with a doctor's excuse due to the illness of Butler's wife. While plaintiff never complained of the difference in his treatment and Butler's until July 1, 1996, after he was told he was being terminated, and never asked for the reason for the alleged differing treatment, he now asserts that he was discharged in retaliation for his complaint of disparate treatment.

At the time of plaintiff's termination, Ken Butler was not in the chronic and excessive absenteeism program nor had he been designated as an irregular worker. Butler was absent from work without prior notice on June 21 and 24, 1996; therefore, he was suspended with the intent to

---

[3] Plaintiff states he filed a charge of race discrimination with the Equal Employment Opportunity Commission after he was terminated and also charged the union with breach of its duty of fair representation. Plaintiff later withdrew the charge against the union. He received a right-to-sue notice with respect to his race discrimination claim against defendant but states he did not have the time to pursue the matter by filing a lawsuit. Taylor's time to file a Title VII race discrimination lawsuit expired before the filing of this action.

12

discharge on June 25, 1996. On June 26, 1996, Butler, defendant, and the union entered into a last

chance agreement,[4] which provided that Butler would be suspended for 30 days, submit to random

drug and alcohol tests, and maintain an absentee rate below 5%. Any failure to comply with these

provisions would be cause for immediate termination. According to defendant, Butler so far has

complied with the terms.

<h2 style="text-align:center">APPLICABLE LAW</h2>

## Summary Judgment Standard

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to

interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine

issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

Rule 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 2509-10, 91

L.Ed.2d 202 (1986). Thus, summary judgment is appropriate where the non-movant "fails to make

a showing sufficient to establish the existence of an essential element to that party's case, and on

which that party will bear the burden or proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 332,

106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The substantive law governing the action determines

whether an element is essential. *Anderson*, 477 U.S. at 248, 106 S.Ct. at 2510. A party seeking

summary judgment always bears the initial responsibility of informing the district court that the basis

for its motion, identifying those portions of the pleading, depositions, answers to interrogatories, and

---

[4] A "last chance agreement" is utilized when an employee has violated a work rule or the employer/employee relationship so as to be subject to immediate discharge. The agreement allows the employee to retain employment subject to certain terms or conditions, the violation of which will result in immediate termination. [Morgan Depo. at 27]. Plaintiff was not under a last chance agreement. [*Id.*]

13

admissions on file, if any, which it believes demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553; *see Brown v. Crawford*, 906 F.2d 667, 669 (11th Cir. 1990), *cert. denied*, 500 U.S. 933, 111 S.Ct. 2056, 114 L.Ed.2d 461 (1991).

This circuit clearly holds that summary judgment should be entered when the moving party has sustained its burden of showing the absence of a genuine issue of material fact when all the evidence is viewed in the light most favorable to the non-moving party, *Sweat v. Miller Brewing Co.*, 708 F.2d 655 (11th Cir. 1983); *see also, Matsushita Electrical Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252, 106 S.Ct. at 2512, 91 L.Ed.2d at 214. The evidence of the non-movant is to be believed and all justifiable inferences are to be drawn in his favor. *Id.* at 255, 106 S.Ct. at 2514, *citing Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 158-59, 90 S.Ct. 1598, 1608-09, 26 L.Ed.2d 142 (1970). It is, therefore, under this standard that the court must determine whether the plaintiff can meet his burden of coming forward with sufficient evidence as to each material element of his claim sufficient to permit a reasonable jury to find in his favor.

When a court is confronted with cross-motions for summary judgment, it must consider each party's motion individually to determine if that party has satisfied the summary judgment standard. *See Matter of Lanting*, 198 B.R. 817 (Bankr. N.D.Ala. 1996); *Williams v. Philadelphia Housing Authority*, 834 F.Supp. 794, 797 (E.D.Pa. 1993); 10A Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure*, § 2720 (1983). Thus, in determining whether genuine

14

and material factual disputes exist, the court must consider the parties' respective memoranda and exhibits and construe all facts, and all reasonable inferences drawn therefrom, in the light most favorable to the respective non-movant. *Matsushita Electrical Industrial*, 475 U.S. at 587-88, 106 S.Ct. at 1356-57. Each side must demonstrate the lack of genuine issues of material fact and entitlement to judgment as a matter of law. *Nolen v. Paul Revere Life Ins.*, 32 F.Supp.2d 211, 213 (E.D.Pa. 1998).

### 42 U.S.C. § 1981

Title 42 U.S.C. § 1981 provides:

> All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other.

The elements and proof for a cause of action under § 1981 are identical to the elements of a Title VII claim. *Walters v. Atlanta*, 803 F.2d 1135 (11th Cir. 1986).

A plaintiff may prove he was discriminated against on the basis of his race in an employment decision by direct evidence, circumstantial evidence, or statistical proof. Even if a § 1981 plaintiff does not present direct evidence of discrimination, he may nevertheless present sufficient circumstantial evidence of discrimination to create a jury question. In evaluating § 1981 claims based on circumstantial evidence, the court uses the framework established by the United States Supreme Court in *McDonnell Douglas Corp. supra*, and *Texas Department of Community Affairs*

15

*v. Burdine*, 450 U.S. 248, 101 S. Ct. 1089, 67 L Ed. 2d 207 (1981). Under that framework, the plaintiff has the initial burden of establishing a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine*, 450 U.S. at 253-54 & n. 6, 101 S. Ct. at 1093-94 & n. 6. Once a *prima facie* case has been established, the burden shifts to the employer to produce a legitimate, non-discriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802, 93 S. Ct. at 1824; *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094. To satisfy the burden of production, the defendant need not persuade the court that it was actually motivated by the proffered reasons, but only need raise a genuine issue of fact as to whether it discriminated against the plaintiff. The employer need only produce admissible evidence which would allow the trier of fact rationally to conclude the employment decision was not motivated by a discriminatory animus. *Burdine*, 450 U.S. at 254-55, 257, 101 S. Ct. at 1094, 1096. If a defendant carries its burden of producing legitimate, non-discriminatory reasons for its decision, the plaintiff is accorded the opportunity to demonstrate that the proffered reason was not the true reason for the employment decision, "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id* . at 256, 101 S. Ct. at 1095. The Eleventh Circuit has held that disbelief of the defendant's proffered reasons, together with the *prima facie* case, is sufficient circumstantial evidence to support a finding of discrimination. Therefore, "a plaintiff is entitled to survive summary judgment, and judgment as a matter of law, if there is sufficient evidence to demonstrate the existence of a genuine issue of fact as to the truth of each of the employer's proffered reasons for its challenged action." *Combs v. Plantation Patterns*, 106 F.3d 1519, 1529 (11th Cir. 1997).

16

To establish a *prima facie* case of discrimination with respect to discipline, a plaintiff must

show: (1) that he belongs to class protected under § 1981; (2) that he was qualified for job; and (3)

that misconduct for which employer discharged plaintiff was same or similar to what similarly

situated employee engaged in, but that employer did not discipline other employee similarly. *See*

*Lathem v. Department of Children and Youth Services*, 172 F.3d 786 (11th Cir. 1999) (Title VII

case). In *Holifield v. Reno*, 115 F.3d 1555, 1562 (11th Cir. 1997), the Eleventh Circuit Court of

Appeals stated:

> Under *McDonnell Douglas*, a plaintiff establishes a prima facie case
> of race discrimination under Title VII by showing: (1) he belongs to
> a racial minority; (2) he was subjected to adverse job action; (3) his
> employer treated similarly situated employees outside his
> classification more favorably; and (4) he was qualified to do the job.
> *McDonnell Douglas Corp.*, 411 U.S. at 802, 93 S.Ct. at 1824, 36
> L.Ed.2d at 677; *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47
> F.3d 1068, 1073 (11th Cir. 1995); *Turnes v. AmSouth Bank, N.A.*, 36
> F.3d 1057, 1060 (11th Cir. 1994). *See St. Mary's Honor Ctr. v.
> Hicks*, 509 U.S. 502, 506, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407
> (1993). Demonstrating a *prima facie* case is not onerous; it requires
> only that the plaintiff establish facts adequate to permit an inference
> of discrimination. *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1308
> (8th Cir. 1994). *See Texas Dep't of Community Affairs v. Burdine*,
> 450 U.S. 248, 253-54, 101 S.Ct. 1089, 1093-4, 67 L.Ed.2d 207
> (1981). . . . As part of the Title VII plaintiff's *prima facie* case, the
> plaintiff must show that his employer treated similarly situated
> employees outside his classification more favorably than herself.
> *Coutu v. Martin Cty. Bd. of Cty. Commissioners*, 47 F.3d 1068, 1073
> (11th Cir. 1995). To make a comparison of the plaintiff's treatment
> to that of non-minority employees, the plaintiff must show that he and
> the employees are similarly situated in all relevant respects. *Smith v.
> Stratus Computer*, Inc., 40 F.3d 11, 17 (1st Cir. 1994); *Mitchell v.
> Toledo Hospital*, 964 F.2d 577, 583 (6th Cir. 1992); *Smith v.
> Monsanto Chemical Co.*, 770 F.2d 719, 723 (8th Cir. 1985), *cert.
> denied*, 475 U.S. 1050, 106 S.Ct. 1273, 89 L.Ed.2d 581 (1986). In
> determining whether employees are similarly situated for purposes of
> establishing a *prima facie* case, it is necessary to consider whether the

17

employees are involved in or accused of the same or similar conduct and are disciplined in different ways. *Williams v. Ford Motor Co.*, 14 F.3d 1305, 1309 (8th Cir. 1994). If a plaintiff fails to show the existence of a similarly situated employee, summary judgment is appropriate where no other evidence of discrimination is present. *See, e.g., Mack v. Great Atlantic and Pacific Tea Co.*, 871 F.2d 179, 182 (1st Cir. 1989).

## FMLA

The Family and Medical Leave Act provides in 29 U.S.C. § 2612(a):

(1) Entitlement to leave

Subject to section 2613 of this title, an eligible employee shall be entitled to a total of 12 workweeks of leave during any 12-month period for one or more of the following:

(A) Because of the birth of a son or daughter of the employee and in order to care for such son or daughter.

(B) Because of the placement of a son or daughter with the employee for adoption or foster care.

(C) In order to care for the spouse, or a son, daughter, or parent, of the employee, if such spouse, son, daughter, or parent has a serious health condition.

(D) Because of a serious health condition that makes the employee unable to perform the functions of the position of such employee.

Subsection (d) of 29 U.S.C. § 2612 allows an employer to require an employee to substitute accrued paid vacation, personal or family leave for any part of the 12-week FMLA leave period. If an employer interferes with or denies FMLA rights to its employee, the employer is liable for damages equal to the amount of any wages, salary, benefits or other compensation denied or lost to the employee, or the actual monetary losses sustained by the employee, in addition to interest and possibly liquidated damages. 29 U.S.C. § 2617(a)(1)(A).

18

All actions under the Family and Medical Leave Act must be brought within two years of

the last action asserted to have violated the Act. 29 U.S.C. § 2617(c)(1). Suit based on actions

alleged to have been a deliberate or willful violation of the Act are governed by a three-year statute

of limitations. 29 U.S.C. § 2617(c)(2).

In the federal regulations interpreting the FMLA, it is stated that the employee need not

expressly invoke the FMLA in requesting leave in order to be entitled to FMLA leave. *See* 29

C.F.R. §§ 825.302[5], 825.303.[6] *But see McGregor v. Autozone, Inc.*, 180 F.3d 1305, 1307-08 (11th

---

[5] Title 29 C.F.R. § 825.302 provides in pertinent part:

> (c) An employee shall provide at least verbal notice sufficient to make the
> employer aware that the employee needs FMLA-qualifying leave, and the
> anticipated timing and duration of the leave. The employee need not expressly
> assert rights under the FMLA or even mention the FMLA, but may only state
> that leave is needed for an expected birth or adoption, for example. The employer
> should inquire further of the employee if it is necessary to have more information
> about whether FMLA leave is being sought by the employee, and obtain the
> necessary details of the leave to be taken. In the case of medical conditions, the
> employer may find it necessary to inquire further to determine if the leave is
> because of a serious health condition and may request medical certification to
> support the need for such leave (see § 825.305).
>
> (d) An employer may also require an employee to comply with the employer's
> usual and customary notice and procedural requirements for requesting leave. For
> example, an employer may require that written notice set forth the reasons for the
> requested leave, the anticipated duration of the leave, and the anticipated start of
> the leave. However, failure to follow such internal employer procedures will
> not permit an employer to disallow or delay an employee's taking FMLA leave
> if the employee gives timely verbal or other notice.

(Emphasis added).

[6] Title 29 C.F.R. § 825.303 states:

> § 825.303 What are the requirements for an employee to furnish notice to an
> employer where the need for FMLA leave is not foreseeable?
>
> (a) When the approximate timing of the need for leave is not foreseeable, an
> employee should give notice to the employer of the need for FMLA leave as soon
> as practicable under the facts and circumstances of the particular case. It is
> expected that an employee will give notice to the employer within no more than
> one or two working days of learning of the need for leave, except in extraordinary

19

Cir. 1999) (finding 29 C.F.R. § 825.208[7] invalid as conflicting with FMLA itself; "[the regulation]

> circumstances where such notice is not feasible. In the case of a medical
> emergency requiring leave because of an employee's own serious health condition
> or to care for a family member with a serious health condition, written advance
> notice pursuant to an employer's internal rules and procedures may not be required
> when FMLA leave is involved.
> (b) The employee should provide notice to the employer either in person or by
> telephone, telegraph, facsimile ("fax") machine or other electronic means. Notice
> may be given by the employee's spokesperson (e.g., spouse, adult family member
> or other responsible party) if the employee is unable to do so personally. _The
> employee need not expressly assert rights under the FMLA or even mention
> the FMLA, but may only state that leave is needed._ The employer will be
> expected to obtain any additional required information through informal means.
> The employee or spokesperson will be expected to provide more information when
> it can readily be accomplished as a practical matter, taking into consideration the
> exigencies of the situation.

(Emphasis added).

---

[7] Title 29 C.F.R. § 825.208 provides in pertinent part:

> (a) In all circumstances, it is the employer's responsibility to designate leave, paid or unpaid, as
> FMLA-qualifying, and to give notice of the designation to the employee as provided in this section.
> In the case of intermittent leave or leave on a reduced schedule, only one such notice is required
> unless the circumstances regarding the leave have changed. The employer's designation decision
> must be based only on information received from the employee or the employee's spokesperson (e.g.,
> if the employee is incapacitated, the employee's spouse, adult child, parent, doctor, etc., may provide
> notice to the employer of the need to take FMLA leave). In any circumstance where the employer
> does not have sufficient information about the reason for an employee's use of paid leave, the
> employer should inquire further of the employee or the spokesperson to ascertain whether the paid
> leave is potentially FMLA-qualifying.
>   (1) An employee giving notice of the need for unpaid FMLA leave must explain the reasons
> for the needed leave so as to allow the employer to determine that the leave qualifies under the Act.
> If the employee fails to explain the reasons, leave may be denied. In many cases, in explaining the
> reasons for a request to use paid leave, especially when the need for the leave was unexpected or
> unforeseen, an employee will provide sufficient information for the employer to designate the paid
> leave as FMLA leave. An employee using accrued paid leave, especially vacation or personal leave,
> may in some cases not spontaneously explain the reasons or their plans for using their accrued leave.
>   (2) As noted in § 825.302(c), an employee giving notice of the need for unpaid FMLA
> leave does not need to expressly assert rights under the Act or even mention the FMLA to meet
> his or her obligation to provide notice, though the employee would need to state a qualifying
> reason for the needed leave. An employee requesting or notifying the employer of an intent to
> use accrued paid leave, even if for a purpose covered by FMLA, would not need to assert such
> right either. However, if an employee requesting to use paid leave for an FMLA-qualifying purpose
> does not explain the reason for the leave--consistent with the employer's established policy or
> practice--and the employer denies the employee's request, the employee will need to provide
> sufficient information to establish an FMLA-qualifying reason for the needed leave so that the

20

converts the statute's minimum of federally-mandated unpaid leave into an entitlement to an

additional 12 weeks of leave unless the employer specifically and prospectively notifies the

employee that she is using her FMLA leave."). It is unclear to what extent the holding in *McGregor*

impacts on the validity of 29 C.F.R. §§ 825.302 and 825.303. *See also Gay v. Gilman Paper Co.*,

125 F.3d 1432 (11th Cir. 1997) ("We agree with *[Manuel v. Westlake Polymers Corp.* and *Price v.*

*City of Fort Wayne]*, where an employee's need for FMLA leave is unforeseeable, the employee

need only provide her employer with notice sufficient to make the employer aware that her absence

is due to a potentially FMLA-qualifying reason."); *Manuel v. Westlake Polymers Corp.*, 66 F.3d 758,

761-64 (5th Cir. 1995) (holding that an employee requesting unforeseeable medical leave is not

required to even mention the FMLA when requesting leave for a serious health condition); *Price v.*

*City of Fort Wayne*, 117 F.3d 1022 (7th Cir. 1997) (employee seeking leave from work for various

medical problems, no one of which alone rose to the level of a serious health condition, provided

employer with sufficient information to put employer on notice of possible FMLA leave situation).

"Serious health condition" is defined in 29 U.S.C. § 2611(11) as "an illness, injury,

impairment, or physical or mental condition that involves--(A) inpatient care in a hospital, hospice,

---

employer is aware of the employee's entitlement (i.e., that the leave may not be denied) and, then, may designate that the paid leave be appropriately counted against (substituted for) the employee's 12-week entitlement. Similarly, an employee using accrued paid vacation leave who seeks an extension of unpaid leave for an FMLA-qualifying purpose will need to state the reason. If this is due to an event which occurred during the period of paid leave, the employer may count the leave used after the FMLA-qualifying event against the employee's 12-week entitlement.

(b)(1) <u>Once the employer has acquired knowledge that the leave is being taken for an FMLA required reason, the employer must promptly (within two business days absent extenuating circumstances) notify the employee that the paid leave is designated and will be counted as FMLA leave. If there is a dispute between an employer and an employee as to whether paid leave qualifies as FMLA leave, it should be resolved through discussions between the employee and the employer. Such discussions and the decision must be documented.</u>

(Emphasis added).

21

or residential medical care facility; or (B) continuing treatment by a health care provider." Title 29

C.F.R. § 825.114 elaborates on the definition of "serious health condition" which would entitle an

employee to FMLA leave:

> (a) For purposes of FMLA, "serious health condition" entitling an
> employee to FMLA leave means an illness, injury, impairment, or
> physical or mental condition that involves:
> \* \* \* \* \*
> (2) Continuing treatment by a health care provider. A serious health
> condition involving continuing treatment by a health care provider
> includes any one or more of the following:
> (i) A period of incapacity (i.e., inability to work, attend school
> or perform other regular daily activities due to the serious health
> condition, treatment therefor, or recovery therefrom) of more than
> three consecutive calendar days, and any subsequent treatment or
> period of incapacity relating to the same condition, that also involves:
> (A) Treatment two or more times by a health care provider,
> by a nurse or physician's assistant under direct supervision of a health
> care provider, or by a provider of health care services (e.g., physical
> therapist) under orders of, or on referral by, a health care provider;
> or
> (B) Treatment by a health care provider on at least one
> occasion which results in a regimen of continuing treatment under the
> supervision of the health care provider.
> \* \* \* \* \*
> (iii) Any period of incapacity or treatment for such incapacity
> due to a chronic serious health condition. A chronic serious health
> condition is one which:
> (A) Requires periodic visits for treatment by a health care
> provider, or by a nurse or physician's assistant under direct
> supervision of a health care provider;
> (B) Continues over an extended period of time (including
> recurring episodes of a single underlying condition); and
> (C) May cause episodic rather than a continuing period of
> incapacity (e.g., asthma, diabetes, epilepsy, etc.).
> \* \* \* \* \*
> (v) Any period of absence to receive multiple treatments
> (including any period of recovery therefrom) by a health care
> provider or by a provider of health care services under orders of, or
> on referral by, a health care provider, either for restorative surgery

22

after an accident or other injury, or for a condition that would likely result in a period of incapacity of more than three consecutive calendar days in the absence of medical intervention or treatment, such as cancer (chemotherapy, radiation, etc.), severe arthritis (physical therapy), kidney disease (dialysis).

(b) Treatment for purposes of paragraph (a) of this section includes (but is not limited to) examinations to determine if a serious health condition exists and evaluations of the condition. Treatment does not include routine physical examinations, eye examinations, or dental examinations. Under paragraph (a)(2)(i)(B), a regimen of continuing treatment includes, for example, a course of prescription medication (e.g., an antibiotic) or therapy requiring special equipment to resolve or alleviate the health condition (e.g., oxygen). A regimen of continuing treatment that includes the taking of over-the-counter medications such as aspirin, antihistamines, or salves; or bed-rest, drinking fluids, exercise, and other similar activities that can be initiated without a visit to a health care provider, is not, by itself, sufficient to constitute a regimen of continuing treatment for purposes of FMLA leave.

(c) Conditions for which cosmetic treatments are administered (such as most treatments for acne or plastic surgery) are not "serious health conditions" unless inpatient hospital care is required or unless complications develop. Ordinarily, unless complications arise, the common cold, the flu, ear aches, upset stomach, minor ulcers, headaches other than migraine, routine dental or orthodontia problems, periodontal disease, etc., are examples of conditions that do not meet the definition of a serious health condition and do not qualify for FMLA leave. Restorative dental or plastic surgery after an injury or removal of cancerous growths are serious health conditions provided all the other conditions of this regulation are met. Mental illness resulting from stress or allergies may be serious health conditions, but only if all the conditions of this section are met.

*     *     *     *     *

(e) Absences attributable to incapacity under paragraphs (a)(2) (ii) or (iii) qualify for FMLA leave even though the employee or the immediate family member does not receive treatment from a health care provider during the absence, and even if the absence does not last more than three days. For example, an employee with asthma may be unable to report for work due to the onset of an asthma attack or because the employee's health care provider has advised the employee to stay home when the pollen count exceeds a certain level.

23

> An employee who is pregnant may be unable to report to work
> because of severe morning sickness.

Under the FMLA, an employee is "unable to perform the functions of the position" within

the meaning of 29 U.S.C. § 2612(a)(1) where the employee's health care provider finds that the

employee "is unable to work at all or is unable to perform any one of the essential functions of the

employee's position within the meaning of the Americans with Disabilities Act" and "the regulations

at 29 C.F.R. § 1630.2(n). An employee who must be absent from work to receive medical treatment

for a serious health condition is considered to be unable to perform the essential functions of the

position during the absence for treatment." 29 C.F.R. § 825.115.

An employee has been held to have a serious health condition worthy of being covered by

FMLA if the employee is: (1) incapacitated for more than three days; (2) seen once by a doctor; and

(3) prescribed a course of medication, such as an antibiotic. *Boyce v. New York City Mission Soc.*,

963 F.Supp. 290 (S.D.N.Y. 1997), citing 29 U.S.C. § 2612(a)(1)(D) and *Brannon v. OshKosh*

*B'Gosh, Inc.*, 897 F.Supp. 1028 (M.D.Tenn. 1995). However, the plaintiff in *Boyce* was held not

to meet the definition of "serious health condition" because she offered no explanation of the cause

of her eight-day leave; there was no indication from what serious medical condition she was

suffering; there was no indication she was actually incapacitated; and she never alleged that she was

prescribed a course of medication to treat her condition. 963 F.Supp. at 299-300. In *Stoops v. One*

*Call Communications, Inc.*, 141 F.3d 309, 314 (7th Cir. 1998), the court held "[w]here an employer

properly requests a physician's certification under the FMLA and that certification indicates the

employee is not entitled to FMLA leave [because he can perform the functions of his job], the

24

employer does not violate the FMLA by relying upon that certification in the absence of some overriding medical evidence."

The legislative history of the FMLA states that examples of "serious health conditions" include but are not limited to the following: heart attacks, heart conditions requiring heart bypass of valve operations, most cancers, back conditions requiring extensive therapy or surgical procedures, strokes, severe respiratory conditions, spinal injuries, appendicitis, pneumonia, emphysema, severe arthritis, severe nervous disorders, injuries caused by serious accidents on or off the job, ongoing pregnancy, miscarriages, complications or illnesses related to pregnancy, such as severe morning sickness, the need for prenatal care, childbirth and recovery from childbirth. H.R.Rep. No. 8, 103rd Cong., 1st Sess., pt. 1 at 29 (1993); U.S. Code Cong. & Admin. News 1993 at pp. 3, 31; *see also*, 58 Fed.Reg. 31,799 (1993). According to Congress, it is these types of illnesses which "meet the general test that either the underlying health condition of the treatment for it requires that the employee be absent from work on a recurring basis or for more than a few days for treatment or recovery." *Id.* On the other hand, Congress sought to exempt those "minor illnesses which last only a few days and surgical procedures which typically do not require hospitalization and require only a brief recovery period." *Id.* at 28. According to Congress, these illnesses should be covered by the employer's sick leave policy. *Id.* It should be emphasized that "[t]he goal [of the FMLA] was not to supplant employer-established sick leave and personal leave policies, but to provide leave for uncommon and, presumably, time-consuming events such as [those specified in § 2612(a)(1)]." *Price*, 117 F.3d at 1023. An employee may be required by his company to use accumulated paid sick and personal leave prior to being eligible for unpaid FMLA leave. 29 U.S.C.

25

§ 2612(d)(2).; *Walthall v. Fulton County School District*, 18 F.Supp.2d 1378, 1381-82 (N.D.Ga. 1998).

In *Oswalt v. Sara Lee Corp.*, 74 F.3d 91 (5th Cir. 1996), the appellate court found that the plaintiff did not establish that his high blood pressure substantially affected one or more major life activities, so as to bring him within the protection of the ADA. However, the court stated it was not implying that high blood pressure in general can never be a "disability" under the ADA (or a "serious health condition" under the FMLA). In *Hodgens v. General Dynamics Corp.*, 963 F.Supp. 102 (D.R.I. 1997), the district court found that the plaintiff's hypertension and heart arrhythmia did not constitute a "serious health condition" within meaning of the FMLA, where the plaintiff's doctor had found that he was able to continue working, and the plaintiff could have obtained medical treatment for his condition without missing work and there was no indication that he could not have carried out the duties of his job.

In *Beal v. Rubbermaid Commercial Products, Inc.*, 972 F.Supp. 1216 (S.D.Iowa 1997), *aff'd*, 149 F.3d 1186 (8th Cir. 1998), the district court held that an employee's back injury was not a serious health condition under the FMLA. Though the employee was out of work for more than three consecutive days and had one follow-up appointment with his physician, his subsequent appointments with the company physician were at request of his supervisor and not for the purpose of treatment, and the employee did not recall if his physician had prescribed any medication for him and did not follow any treatment regimen. The court noted that "[i]n the FMLA's legislative history, the Senate Committee Report listed the following as examples of 'serious health conditions': '[B]ack conditions requiring extensive therapy or surgical procedures . . . spinal injuries . . . injuries caused

26

by serious accidents on or off the job.'  S.Rep. No. 103-3, at 63  (1993), reprinted in 1993

U.S.C.C.A.N. 3." *Id.* at 1223.

In *Vargo-Adams v. United States Postal Service*, 992 F.Supp. 939 (N.D.Ohio 1998), the

district court held that genuine issues of material fact existed, precluding summary judgment for the

defendant, on whether the plaintiff's migraine condition was a "serious medical condition" for

FMLA purposes, even if incapacity rarely occurred on three consecutive days.  The plaintiff

presented evidence that she made six visits to her health care provider for treatment of migraines,

including treatment sought some 15 months before a last chance settlement agreement.  *See also*

*Ware v. Stahl Specialty Co.*, 1998 WL 184267 (W.D.Mo. April 9, 1998) (jury could reasonably find

that employer put on notice by plaintiff's frequent absences due to migraines and doctor's slips from

several physicians indicating treatment for migraines that plaintiff suffered from a recurrent migraine

condition for which he had seen several physicians, that might constitute a chronic serious health

condition as defined in the FMLA); *Rhoads v. Federal Deposit Insurance Co.*, 956 F.Supp. 1239

(D.Md. 1997) (plaintiff with asthma and migraines could have "serious health condition" if

incapacity required absence from work of more than three calendar days and involved continuing

treatment by health care provider, per 29 C.F.R. § 825.114; plaintiff presented evidence from herself

and doctors that she was limited by migraine and asthma attacks in ability to perform everyday

activities, including ability to drive, work, and breathe); *Hendry v. GTE North, Inc.*, 896 F.Supp.

816, 827-28 (N.D.Ind. 1995) (summary judgment not appropriate where plaintiff's headaches created

a genuine issue of fact as to whether plaintiff had a serious health condition which rendered her

unable to perform the functions of her job; evidence showed plaintiff was receiving "continuing

27

treatment" for migraines from her doctor and suggested migraines rendered her "unable to perform the functions" of her job, per plaintiff's and her doctor's testimony).

## CONCLUSIONS OF LAW

### 42 U.S.C. § 1981 Claim

In this case, plaintiff has not provided direct evidence of racial discrimination. Instead, he relies on circumstantial evidence and asserts he was subjected to disparate treatment in discipline. Therefore, the court applies the *McDonnell Douglas/Burdine* analysis, as amplified by the Eleventh Circuit in *Holifield*, to the evidence adduced in this action.

Plaintiff has established that he is a member of a class protected under § 1981. He also has demonstrated that he was subjected to adverse employment action and that he was qualified for his job. However, plaintiff has failed to establish that he was similarly situated to Ken Butler. Defendant has shown that Butler's situation was different from plaintiff's, in that his suspension was based on being absent from work without notification or permission for two days. Butler was not in the chronic and excessive absenteeism program, as plaintiff was. Butler had not been absent from work excessively over a long period of time, as plaintiff had been.

While plaintiff claims that Butler was away from work to care for his sick wife for a period of time and that Butler's absentee rate was "much worse" that his (Plaintiff's Affidavit, Exh. 1 to Doc. #36), plaintiff has not provided any proof that Butler's absences over a period of time were equal to or greater than plaintiff's nor that they were sufficient for placement in the chronic and excessive absenteeism program. Plaintiff could have obtained this information through discovery.

28

Without this necessary information, the court cannot conclude that Butler's absences were as extensive as plaintiff's or that he should have been placed in the chronic and excessive absenteeism program.

Plaintiff also has provided the affidavit of Samson Hall, another former employee of defendant. Mr. Hall avers defendant at its Oak Grove Mine treated black employees differently than white employees with respect to discipline for attendance. Mr. Hall was readmitted to a facility for treatment of alcoholism but was terminated when he attempted to return to work, for violation of a last chance agreement, despite a doctor's excuse. He avers that white employees who were absent with a doctor's excuse were not treated as absent. However, the identities of these employees are not given, nor are any supporting factual details. Mr. Hall also refers to Tim Engle, a white employee who was fired after an on-the-job injury, possibly caused by Engle being under the influence of drugs, but was rehired despite having been subject to a last chance agreement. His circumstances, however, are not similar to plaintiff's. Joanne McGeehee also is mentioned as an employee "absent on numerous occasions" but not terminated despite being in the absentee program. However, no details are provided regarding the actual number of absences to allow the court to determine whether McGeehee's situation is similar to plaintiff's. Again, this information could have been obtained through discovery. The averments in Mr. Hall's affidavit do not help plaintiff to establish his case.

The court finds that plaintiff has failed to establish a *prima facie* case of race discrimination in discipline. Based on the foregoing, the court finds that defendant is entitled to judgment as a matter of law with respect to plaintiff's § 1981 claim of race discrimination.

29

**Retaliation**

In order to establish a *prima facie* case of Title VII retaliation, Mr. Taylor must show "(1)
statutorily protected expression, (2) adverse employment action, and (3) a causal link between the
protected expression and the adverse action." *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163
(11th Cir. 1993). Once a plaintiff has established a *prima facie* case, the defendant must then come
forward with "legitimate reasons for the employment action to negate the inference of retaliation."
*Id.* at 1163. If the defendant offers legitimate reasons for the employment action, the plaintiff then
bears the burden of proving, by a preponderance of the evidence, that the reasons offered are
pretextual. *Id.* A causal link can be established if "the protected activity and the adverse action were
not wholly unrelated." *Id.*; *see also Taylor v. Runyon*, 175 F.3d 861, 868 (11th Cir. 1999); *EEOC
v. Reichhold Chemicals, Inc.*, 988 F.2d 1564, 1571-72 (11th Cir.1993).

Plaintiff has not established a *prima facie* case that he was discharged in retaliation for
complaints of perceived race discrimination. The evidence shows conclusively that plaintiff did not
assert, prior to the decision to discharge him, that his discipline was racially motivated nor that the
alleged disparity in his discipline and Ken Butler's was due to race. He did not make any such claim
to George Weber during the first telephone call nor did he make such a claim prior to or during the
24/48 meeting. It was not until after his termination that plaintiff accused defendant of race
discrimination. However, even now, plaintiff's deposition testimony reveals that he considers the
actual cause of his termination to be his initial complaint to George Weber about the two-day
suspension during the progressive discipline imposed under the absentee program. He believes that
his termination, rather than a 30- or 60-day suspension, was brought about because he went "over

30

the head" of his supervisors and management at the Oak Grove Mine, as indeed was expressed by Ron Osborne at the 24/48 meeting. Further, the evidence supports the determination that plaintiff was fired because of his chronic and excessive absenteeism, after he had been given ample warning and opportunity to ameliorate his attendance problems, in accordance with a valid and evenly-applied discipline policy. There is simply insufficient evidence for the court to infer, let alone conclude, that plaintiff's termination was motivated by retaliation for a complaint of race discrimination. Therefore, defendant is entitled to judgment as a matter of law with regard to this claim.

## FMLA Claim

Plaintiff's FMLA claim is based on defendant's failure to consider leave taken for health reasons (his and his son's) to be covered by the FMLA. If the leave in question occurred prior to March 24, 1996, two days before the date on which plaintiff was suspended for two days after being placed in Step 3 of the absentee program, any claim with respect to such leave is barred by the two-year statute of limitations. There is no basis in the record for a finding that defendant acted deliberately or willfully; therefore, the three-year alternate statute of limitations is not applicable. However, with respect to any leave taken on or after March 25, 1996, the court may consider the merits of the FMLA claim. It is not clear whether the one day of leave taken by plaintiff for his back injury after picking up the plumbing snake occurred before March 24, 1996; his warning and notice of suspension were given on March 26. With respect to any of the five days plaintiff was absent from work between March 26, 1996, and plaintiff's date of termination, July 1, 1996, the court has

31

been provided with no information as to the reason for those absences and, thus, cannot determine whether the FMLA may have been applicable to those absences. The court, construing the evidence in the light most favorable to plaintiff, since it is defendant's motion for summary judgment that raises the statute of limitations and "serious health condition" issues, will deem those absences due to plaintiff's high blood pressure, back pain or migraines. Further, the court will take as established that plaintiff provided a doctor's excuse for those absences.[8]

Defendant also argues that plaintiff was not qualified for FMLA leave because his condition or conditions were not "serious" as defined by the FMLA. The court notes it is undisputed that leave taken by plaintiff to care for his son after the son's accident was covered under the FMLA; however, since it appears any such leave was taken prior to March 24, 1996, any claim with regard to those days off is barred by the statute of limitations.

There is no evidence that plaintiff's one-day absence for back pain which occurred after he picked up the plumbing snake is a "serious medical condition." Plaintiff was absent for one day and, while he did consult his doctor, he does not allege nor offer proof that he was prescribed medication or therapy or required surgery for the injury. Because plaintiff was not entitled to FMLA leave for that day off, he has no FMLA claim.

---

[8] The court finds that defendant's policy or practice of requiring its employees to make a specific request that leave be counted as FMLA-covered leave is in direct contravention of 29 C.F.R. §§ 825.302, and 825.303, as interpreted by the Eleventh Circuit and other courts. Those regulations clearly permit an employee to request leave without specifically mentioning the FMLA and places the burden on the employer to determine if the leave could be counted as FMLA leave and notify the employee of its decision regarding the applicability of the FMLA to the leave in question. This is true even though defendant is relying on the CBA as support for its argument. If indeed the CBA requires a specific reference by the employee to the FMLA, any such provision is due to be stricken as unlawful.

32

With respect to the other five days plaintiff was absent from work, between March 26 and June 27, 1996, plaintiff has not offered any proof that the back pain, migraine or high blood pressure which caused those absences rose to the level of a "serious medical condition." The regulation at 29 C.F.R. § 825.114(a)(2)(iii) provides that a serious health condition requiring continuing treatment by a health care provider may include any period of incapacity due to a chronic serious health condition. That, in turn, is defined as a condition which requires periodic visits for treatment, continues over a period of time, and may cause episodic periods of incapacity. However, plaintiff has presented no evidence to this court that his blood pressure or migraines incapacitated him to the extent that he was unable to come to work, that his doctor considered him unable to perform the functions of his job on the days he was absent, or that he was on a regimen of prescribed medication for his blood pressure or headaches. He has not submitted any statement from his doctor nor any copies of pertinent parts of his medical records to assist this court in its determination whether his absences were subject to the FMLA or more "run of the mill" ailments that are covered only by defendant's regular sick leave policy.

Therefore, defendant is entitled to summary judgment in its favor on plaintiff's FMLA claim, and plaintiff's motion for partial summary judgment is due to be denied.

A separate order in conformity with this Memorandum Opinion will be entered contemporaneously herewith.

**DONE** this ___27th___ day of September, 1999.

HARWELL G. DAVIS, III
UNITED STATES MAGISTRATE JUDGE

33